UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD HOWARD WATKINS,<br><br>Petitioner,<br><br>v.<br><br>KEVIN HIXSON,[1]<br><br>Respondent. | No. 2:22-cv-1158 WBS CKD P<br><br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is proceeding pro se with a petition for writ of habeas corpus under 28 U.S.C. § 2254. On September 29, 2017, petitioner was convicted of first-degree murder following a jury trial in the Superior Court of San Joaquin County. ECF No. 4 at 138. On January 7, 2019, he was sentenced to 75 years to life in prison. Id. at 139. Petitioner presents three grounds for relief. For the reasons which follow, the court recommends that the petition for a writ of habeas corpus be denied.

/////

/////

/////

/////

---

[1] Warden Kevin Hixson is hereby substituted as the respondent in this action pursuant to Rule 2 of the Rules Governing Section 2254 Cases.

1

I. Background

On direct appeal, the California Court of Appeal summarized the evidence presented at trial and other relevant facts as follows:

> On the night of March 15, 2014, Jeremy Chambers discovered a body while looking for recyclables in a dumpster behind a Manteca shopping center. His fiancé called 911. Manteca police officers found the body of a dead woman, naked from the waist up, covered by a cardboard box. The ligature marks on her neck were consistent with strangulation using a cylindrical material. She died at least 36 hours before the March 17 autopsy and showed signs of being a methamphetamine user.
>
> The woman was identified as 22-year-old Kelly M. Her mother reported her missing on March 17. She had given Kelly a white Mitsubishi Lancer. On March 11, Kelly's mother saw defendant driving the Lancer with Kelly as a passenger.
>
> April Scharff was collecting cans and bottles from a dumpster by a nearby Circle K store on March 16 when she found a pillowcase containing women's clothing, and a backpack. The backpack contained Kelly's journal and a torn camisole. A friend identified the camisole as Kelly's; when Kelly wore it a few days earlier, it was not torn. Video surveillance from the Circle K showed defendant was inside the store on March 15 at 8:14 p.m. and at 11:54 a.m. on March 16.
>
> A surveillance video showed that on March 15, at 10:27 p.m., a man[2] with a white shirt pulled over his head placed a comforter containing a body in the dumpster, pulled the comforter away so the body rolled out, and then covered the body with a cardboard box from the dumpster. A comforter with that design and a pillow were found missing from room 117 of the Pacific Express Inn, a low budget hotel in Manteca. The hotel was 0.8 miles from where Kelly's body was found. The room was registered to Kelly from March 13 through March 16, and defendant was seen in the room for several days before the comforter disappeared. An unplugged table lamp was found on the floor.
>
> Defendant was at the Pacific Express Inn on March 13 with Kelly and her friends Ashley Noonan, Brittany Westerdale, and Westerdale's boyfriend Benjamin Voget. Kelly smoked methamphetamine while defendant drank vodka. Defendant sold some marijuana to Noonan, who testified that defendant and Kelly interacted like business partners who were trying to sell various items. They did not appear to have any romantic relationship with each other. At one point, defendant told Kelly in a rude voice to pick her stuff up from the bed.

---

[2] During closing argument, defense counsel admitted defendant was the person who dumped Kelly's body in the dumpster.

2

> Defendant and Voget then took Kelly's car to go to Stockton; defendant drove. They went to several liquor stores. During the drive, defendant told Voget he wanted to get to know Kelly and thought Voget's girlfriend Westerdale could help him with this. Voget told defendant Kelly would like whom she chooses and nothing he could do would help persuade her to do anything.
>
> Heading back to Manteca, defendant lost control of the car and got it stuck in a drainage ditch by the onramp to Interstate 5. As the Highway Patrol was arriving, defendant told Voget to say that he rather than defendant was driving the car. Defendant first told the responding officers that someone else had been driving the car, and then tried to blame Voget. Defendant's voice was raspy and slurred; when officers tried to arrest him, he ran across the southbound lanes and onto the center median. The officers had to use a taser to arrest defendant. Defendant was booked into San Joaquin County Jail at 5:19 a.m. on March 14 and released that day at 11:24 a.m. Kelly's car was towed away at this time.
>
> Voget returned to the hotel without defendant and he and Westerdale slept there for a while. Later on March 14, Westerdale and Voget went to Voget's parents' house; Westerdale talked to Kelly on her cell phone at 8:30 p.m.
>
> On March 15, Bryan McDonald gave defendant a ride to Stockton at the request of McDonald's friend Skip. Defendant told McDonald he needed to pay for an impounded car that he had crashed. At one point, defendant purchased cocaine and marijuana, combined them into a "chewy" cigarette, and smoked it. He told McDonald that he did not want to pay for Kelly's car, and something like it was not his fault. On the way back to Manteca, defendant told McDonald he had a "sexy" or "hella pretty" woman waiting for him, a girl who was "wife material."
>
> Defendant and McDonald returned to the Pacific Express Inn before 11:45 a.m. Defendant invited McDonald into the room to smoke some marijuana and get gas money. Kelly was in the room when McDonald entered and got $20 gas money from defendant. McDonald left after about five minutes.
>
> DNA from the cardboard box covering Kelly's body in the dumpster matched defendant's. Defendant's DNA was also found on samples taken under Kelly's fingernails. Swabs from Kelly's breasts had the DNA of two people; Kelly was the major contributor and defendant the minor. The lamp cord from the hotel room contained the DNA of four or five persons, a mixture too complex to identify contributors.

ECF No. 21-12 at 2-5.

Petitioner appealed his conviction and sentence to the California Court of Appeal. ECF No. 21-9. The Court of Appeal affirmed. ECF No. 21-12. Petitioner sought review of the

/////

3

California Court of Appeal's decision in the California Supreme Court. ECF No. 21-13. The petition for review was denied. ECF No. 21-14.

II. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ of habeas corpus is not available for alleged error in the interpretation or application of state law. See <u>Wilson v. Corcoran</u>, 562 U.S. 1, 5 (2010); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.2d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following limitation on the granting of federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different, as the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams</u> [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002).

4

1    "A state court's determination that a claim lacks merit precludes federal habeas relief so
2    long as 'fairminded jurists could disagree' on the correctness of the state court's decision."
3    Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652,
4    664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a
5    state prisoner must show that the state court's ruling on the claim being presented in federal court
6    was so lacking in justification that there was an error well understood and comprehended in
7    existing law beyond any possibility for fairminded disagreement."  Richter, 562 U.S. at 103.
8    The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the
9    state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter,
10   562 U.S. at 98).
11   The court looks to the last reasoned state court decision as the basis for the state court
12   judgment.  Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011).  Here, the last reasoned decision
13   was issued by the California Court of Appeal.  ECF No. 21-12.

### III. Claims and Analysis

#### A. Claims Arising Under California Law

As indicated above, a writ of habeas corpus is only available for violations of federal law. In his petition, petitioner asserts the trial court erred in finding evidence admissible under Sections 1250 and 1241 of the California Evidence Code.  ECF No. 9 at 38 & 47.  Because petitioner's claims arise under state law, he cannot obtain habeas corpus relief under federal law.

#### B. Limitation of Defense Evidence

Petitioner claims his Constitutional rights were violated by the trial court's limitations placed upon the cross examination of Sgt. Schluer, the lead investigator into the murder of Kelly M.  The California Court of Appeal addressed this claim as follows:

> A. *Background*
>
> The prosecution filed a pretrial motion to exclude various tips related in the police report regarding the culpability of persons other than defendant for the murder.  Among the possible suspects named in these tips were Kelly's ex-boyfriend Devon Martin, David Olivera, and Brandon Beatty. The motion pointed out how the other suspects had been cleared, and asserted there was no reliable direct or circumstantial evidence linking any of them to Kelly's murder.

5

Defense counsel filed an opposition asserting defendant had a right to crossexamine officers regarding whether they had neglected to pursue plausible leads about third parties. The reply asserted this was particularly true with respect to Devon Martin, because Kelly had recently broken up with him, had begun dating his best friend Zakk Vance, and Kelly had reportedly said Martin would kill her if he found out. Counsel further asserted Martin had reportedly abused Kelly, Martin had obtained a love poem Kelly had written to Vance, and Martin had made an incriminating statement to his mother, Christina Zuk. Counsel also claimed discovery materials showed Kelly's phone called Zakk Vance after her body was found in the dumpster, and officers did not ask Vance about the call until early 2017.

During a pretrial hearing on the motion, the prosecutor stated that his motion listed "pretty much" every person that the police were told could have been a possible suspect, the Manteca police investigated all of them, and determined they were not suspects. The prosecutor also noted none of these people had a motive or were seen around the victim at the time of her death. Defense counsel replied, "that this was a case where there was a lot of noise, apparently people were willing to make accusations in a very flagrant manner; however, I disagree that it's really an issue of third party culpability." Rather than a third party culpability defense, where defendant would present evidence that another person committed the crime, here the defense sought "to show that a reasonable doubt exists, based upon the unwillingness or inability of the police to pursue plausible investigative leads in this case." The trial court deferred ruling on the motion until hearing the prosecution's case-in-chief.

The prosecutor noted in his opening statement that there were other suspects in the early stages of the investigation, Kelly's ex-boyfriend Devon Martin, and two other men, David Olivera and Brandon Beatty, who came to the hotel room after defendant and Voget left in Kelly's car on March 13. The prosecutor told the jury defendant became the focus of the investigation when defendant's DNA showed up on Kelly's body and on the box in the dumpster. Defense counsel argued in opening that no one knows who killed Kelly and the evidence would not show that defendant did it.

Following the direct examination of the lead investigator in the case, Manteca Police Sergeant Steven Schluer, defense counsel sought permission to question Sergeant Schluer about following up investigative leads. Counsel asserted this was not offered as third party culpability evidence, and while the questioning would rely on hearsay statements, the statements would not be offered for their truth but for the officer's state of mind. In particular, the defense sought to question Sergeant Schluer about Devon Martin and Zakk Vance.

The prosecutor replied that all of the evidence involved hearsay or multiple levels of hearsay. For example, one statement the defense referred to was characterized by the prosecutor as "some talk that Kelly said she was afraid Devon [Martin] might kill her if . . . [he] found out about some letter . . . nobody even knows if [he] found the

6

letter." The prosecutor additionally noted that in this same statement Kelly said she was afraid defendant would cut her head off.

The trial court stated defense counsel was "entitled to ask the officer questions about what he did do, what he didn't do, to whom he spoke, and the names of the people to whom he did not speak." It also found a constitutional issue on the limitation on hearsay by expert witnesses as stated in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), and posited that the limitation on using hearsay applied even more so here because Sergeant Schluer was not an expert witness.[3] Accordingly, while the defense could ask the officer, "did you investigate this, did you talk to this witness, did you lift a fingerprint off this, did you try to get a print, so on and so forth," getting into hearsay statements was a different problem.

The trial court stated the defense could call witnesses with firsthand knowledge of the relationship between Martin and Kelly, but defense counsel replied that such witnesses were unavailable. Counsel noted that one of the statements he wished to question Sergeant Schluer about was a statement by Devon Martin's father Drew Martin, that Devon Martin's mother, Christina Zuk, told him that Devon called her and said he wanted to move out to Arizona with her because he had nowhere to go, nowhere to stay, had broken up with his girlfriend, and was in trouble in California. Defense counsel told the court that allegations of abuse by Devon Martin against Kelly were supported by two witnesses, although it was not clear what they said. The prosecutor replied that neither witness could describe any injury to Kelly and said only that she could have been the victim of abuse. The court ruled that the defense could not ask Sergeant Schluer about statements in police reports regarding Martin's relationship with Kelly and statements he might have made after they broke up. Counsel could ask if Sergeant Schluer "spoke to these witnesses and if he did any follow-up as a result of speaking to the witnesses, but as far as [what] they said, I don't think it's appropriate to ask." The court noted that in addition to the hearsay issues, the probative value of the statements was outweighed by their prejudicial effect on the prosecution.

Regarding the phone call to Zakk Vance after Kelly's body was found in the dumpster, the prosecutor stated that about three minutes after Kelly was put in the dumpster, her phone first dialed a nine for about 22 seconds and then dialed Zakk Vance's phone for about two seconds. The trial court ruled that the defense could elicit evidence of the call, as well as the fact that Devon Martin asked to see a photograph of defendant when he was questioned about the case.

/////

/////

---

[3] Later, the trial court stated that *Sanchez* was limited to case specific issues, this case did not involve an expert witness, and that it mentioned the *Sanchez* decision for "context."

7

B. *Analysis*

Defendant contends the trial court denied him the right to confrontation by foreclosing questioning about all information police received concerning Devon Martin's possible involvement in the murder. He contends the proffered cross-examination had the nonhearsay purpose of showing the police failed to investigate leads, and the trial court's ruling to the contrary was based on an incorrect reading of *Sanchez*, *supra*, 63 Cal.4th 665. Arguing that the evidence satisfied the standard for third party culpability evidence, defendant concludes the trial court prejudicially erred.

The Sixth Amendment affords all defendants the right to confront and crossexamine witnesses against them. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678 [89 L.Ed.2d 674, 683] [the right of cross-examination is "secured for defendants in state as well as federal criminal proceedings"].) The defense is typically given wide latitude to test the credibility of such witnesses, but the trial court may still place reasonable limits on defense counsel's inquiries. (*People v. Pearson* (2013) 56 Cal.4th 393, 455.) Trial courts have broad discretion to impose reasonable limits on cross-examination, "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Van Arsdall*, at p. 679 [89 L.Ed.2d at p. 683]; see *Pearson*, at p. 454 ["trial courts have broad discretion ' "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues . . . ." ' "].) " '[T]he Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' [Citations.]" (*United States v. Owen* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 957].)

"[T]hird party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of [the] defendant's guilt,' but . . . '[w]e do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (*People v. Robinson* (2015) 37 Cal.4th 592, 625.) "[I]n making these assessments 'courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible [citation] unless its probative value is substantially outweighed by the risk of undue delay, prejudice or confusion [citation].' " (*Ibid*.)

A trial court has broad discretion in deciding the admissibility of all evidence, including hearsay evidence. (*People v. Beeler* (1995) 9 Cal.4th 953, 978.) We review any trial court ruling on admissibility of evidence for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) Of course, the scope of discretion always resides in the particular law being applied, such that we determine as a question of law whether the trial court applied an incorrect legal standard. (*People v. Parmar* (2001) 86 Cal.App.4th 781, 793.)

8

Defendant relies primarily on *Alvarez v. Ercole* (2nd Cir. 2014) 763 F.3d 223 (*Alvarez*). In support of "his main defense theory[] that the police investigation into the murder was flawed and had improperly disregarded a promising alternate suspect," Alvarez sought to elicit testimony from the lead detective about a police report that identified someone other than Alvarez as a potential suspect. (*Id*. at pp. 225, 228.) The state trial court erred by precluding this line of inquiry on hearsay grounds and failing to recognize that Alvarez offered the testimony for the nonhearsay purpose of showing that law enforcement failed to conduct a proper investigation. (*Id*. at p. 225.) In doing so, the Second Circuit panel concluded that the trial court violated Alvarez's rights under the Confrontation Clause because, "by cutting off this line of questioning," the court's evidentiary rulings "effectively denied Alvarez the opportunity to develop his only defense" and "left Alvarez without any support for his theory of the case." (*Id*. at pp. 225, 232.)

The evidence supporting the alternative suspect was much stronger in *Alvarez* than here. Alvarez was charged in a drive-by shooting in which no forensic evidence tied him to the case, and no witnesses could identify the shooter on the day of the shooting. (*Alvarez*, *supra*, 763 F.3d at p. 226.) A person named Vasquez told the police shortly after the murder that his acquaintance Julio Guerrero told Vasquez that he had killed a man for insulting him and his wife. (*Id*. at pp. 226-227.) Vasquez gave the police Guerrero's phone number, but the police never called or contacted Guerrero. (*Id*. at p. 227.) By contrast, none of the tips that defendant sought to use in cross-examination implicated any other person in Kelly's murder. At most, the hearsay statements were minimally probative of a jealousy motive for Devon Martin. However, such relevance is undercut by the fact that the best evidence supporting this theory, Kelly's statement that Martin would kill her if he found a letter she sent, also contained the statement that defendant would cut her head off. Likewise, Martin's cryptic statement that he was in trouble in California does not approach the relevance of the statement in *Alvarez* where the other suspect admitted committing a murder. The phone call to Kelly's boyfriend Zakk Vance, a 22-second call to the number nine followed by a two-second call to Vance is consistent with an accidental call. Finally, unlike *Alvarez*, there was forensic evidence implicating defendant, his DNA on the box, Kelly's breasts, and under her fingernails, and he was seen placing her body in the dumpster.

Even assuming *Alvarez* is correct and evidence of police failure to investigate tips can be admissible for a nonhearsay purpose, the court here was well within its discretion to exclude the proposed line of questioning under Evidence Code section 352.[4] The relevance was

---

[4] We also reject defendant's claim the trial court improperly relied on *Sanchez*. The court initially did make some statements relating *Sanchez*'s hearsay analysis to the case before it, but eventually noted this case did not involve expert testimony and that *Sanchez* was mentioned only to provide context. Since we uphold the trial court's ruling on its separate Evidence Code section 352 analysis, any reliance on *Sanchez* is irrelevant to our ruling.

9

> slight. Kelly's statement that Martin would kill her shows no more than a possible motive to kill her, which is no more than minimally relevant without other evidence tying Martin to the murder. Likewise, the statement by Martin's mother that her son called her and said he was in trouble does not in any way raise doubt about the prosecution's case as there is no evidence tying this statement to the charged crime. The leads the police did not follow up on here were not third party culpability evidence; the fact that someone else may have had a motive to kill the victim is useless without additional evidence. Furthermore, even defense counsel admitted third party culpability was not a defense theory. The theory of the defense at trial, that there was insufficient evidence that defendant killed the victim, was not supported by the tips at issue here. Allowing the defense to raise the failure to follow these leads would introduce confusing and irrelevant evidence. Since the trial court's decision was correct under Evidence Code section 352, the right to confrontation is not implicated. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623 ["notwithstanding the confrontation clause, a trial court may restrict cross-examination of an adverse witness on the grounds stated in Evidence Code section 352"]; *People v. Harris* (2005) 37 Cal.4th 310, 336 ["the application of ordinary rules of evidence does not implicate the federal Constitution"].)
>
> We are similarly unconvinced by defendant's theory of admissibility as third party culpability evidence. First, defense counsel expressly disclaimed this theory, forfeiting the claim on appeal. Furthermore, as noted, the evidence was minimally relevant to motive and nothing else, and therefore did not meet the standard of admissibility for third party culpability evidence.

ECF No. 21-12 at 5-12.

Petitioner does not argue that the California Court of Appeal's rejection of petitioner's claim is based upon an unreasonable determination of the facts. As for the law, the California Court of Appeal correctly articulated the Supreme Court's position from Van Arsdall which guarantees the right of cross examination but also sets limits on its scope. Petitioner fails to point to anything suggesting that the Court of Appeal's application of the legal principles concerning cross examination articulated in Van Arsdall is unreasonable or contrary to clearly established Supreme Court precedent. For these reasons, petitioner's claim is precluded by 28 U.S.C. § 2254(d).

Further, even if there was error, petitioner is not entitled to relief because he fails to show substantial and injurious effect or influence in determining the jury's verdict as required under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). There was direct evidence of petitioner's guilt in the form of DNA evidence and the fact that petitioner attempted to hide Kelly M.'s death by

placing her body in dumpster and disposing of her personal items.

C. Due Process

Petitioner claims his Constitutional right to a fair trial was violated by admission into evidence of a statement the victim made to him and a separate statement made to Brittany Westerdale. On direct appeal, the Court of Appeal summarized the admission of both statements into evidence as follows:

> During the direct examination of Brittany Westerdale, she testified that when he came back to the room with another woman with whom he had spent time, defendant said to Kelly, referencing the other woman: "That's the kind of girl that would take your boyfriend," to which Kelly replied, "You're not my boyfriend." Defendant made a mean comment to Kelly about 20 to 30 minutes after she said he was not her boyfriend. Defendant raised a hearsay objection; the prosecutor replied it was offered to show the victim's state of mind, that she was not sexually interested in defendant. The trial court admitted the statement as state of mind evidence pursuant to Evidence Code section 1250.
>
> Later, Westerdale testified that she called Kelly with her boyfriend Voget's phone at 8:30 p.m. on March 14. She said that Kelly told her she was waiting for defendant, who was going to help get her car out of impoundment. Defendant made a hearsay objection. The court found it admissible as state of mind evidence and under Evidence Code section 1241 as a contemporaneous statement.

ECF No. 21-12 at 12-13.

The Court of Appeal found that the first statement was properly admitted as not being offered for the truth of the matter asserted:

> There was evidence defendant was romantically or sexually interested in Kelly; he made statements that she was attractive, was wife material, and asked for help in connecting with her. However, there was also other evidence she did not reciprocate, that she and defendant had a more businesslike relationship. Her retort to defendant's flirtatious statement was admissible not to show that he was not, in fact, her boyfriend, but that she said this to him in front of another person, thus potentially angering or humiliating him, which is evidence of his motive to kill her.

Id. at 13-14.

As for the second statement:

> Evidence Code section 1250 provides for the admission into evidence "of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent,

11

> plan, motive, design, mental feeling, pain, or bodily health)" when "offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action." (*Id.*, subd. (a)(1).)  However, this provision "does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed." (*Id.*, subd. (b).)
>
> Also, an out of court statement is not hearsay if "offered to explain, qualify, or make understandable conduct of the declarant" and the statement is "made while the declarant was engaged in such conduct." (Evid. Code, § 1241.)
>
> Kelly's statement did not describe her state of mind and her state of mind at the time was not at issue.  It also does not explain Kelly's conduct. As the Attorney General properly concedes, it was inadmissible.
>
> This nontestimonial statement does not implicate defendant's right to confrontation and its erroneous admission did not deprive him of the right to a fair trial. Accordingly, we examine the error under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Duarte* (2000) 24 Cal.4th 603, 619 [*Watson* standard is applicable to state law error in admission of hearsay].)  There was ample evidence that defendant and Kelly were in close proximity before she was murdered; they shared the hotel room where she was likely murdered, and defendant put her body in the dumpster.  In addition, a witness, McDonald, saw defendant with Kelly in the hotel room together on the day of the murder, which minimizes the importance of the erroneously admitted hearsay by providing independent proof that defendant was in the room with Kelly on the day of her murder. It is not reasonably probable that defendant would obtain a more favorable result if this hearsay was not admitted.[5] (*Watson*, at p. 836.)

Id. at 14-15.

To amount to a violation of the Due Process Clause, the admission of evidence must have denied the defendant a fair trial.  See e.g. Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir.1995). The first statement about which petitioner complains was properly admitted into evidence.  And given the physical, direct, and circumstantial evidence implicating petitioner in the murder, even the erroneous admission of the second statement did not deny petitioner a fair trial. As noted by the Ninth Circuit in Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) the Supreme Court has never held that failure to exclude "irrelevant or overtly prejudicial evidence constitutes

---

[5] Since we find only one error and conclude it was harmless, defendant's claim of cumulative error is without merit.

12

a due process violation." This being the case, the court cannot find the Court of Appeal's rejection of petitioner's due process claim "is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." As such, and because petitioner fails to show that the Court of Appeal's decision with respect to his claim is based upon an unreasonable interpretation of facts, petitioner is precluded from obtaining relief under 28 U.S.C. § 2254(d).

IV. Conclusion

For all these reasons, the court will recommend that petitioner's petition for a writ of habeas corpus be denied, and this case be closed.

IT IS HEREBY RECOMMENDED that:

1. Petitioner's petition for a writ of habeas corpus (ECF No. 9) be DENIED; and

2. This case be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: June 20, 2025

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
walk1158.157